Well, our first case today will be Harnish v. Widener University School of Law, number 15-3888. We'll hear from the appellant. Thank you, your honor. David Stone from Stone & Magdalene for the appellant. Okay, welcome. Will you be reserving any time? Yes, I will be reserving three minutes for both. Okay, that's granted. So, your honor, this is an appeal from a decision on class certification by the district court, and the only two issues that the district court found lacking were predominance and typicality. So, I'm not going to bother with the other ones. I'm just going to focus on those, and I'm primarily going to focus on is that this court has found, on a number of occasions, and most recently in the Waze v. Net Deposit matter, that simply because there are individual questions of fact regarding damages does not justify defeating a predominance finding. And the United States Supreme Court has said that in a number of cases as well, which we've cited. And, in fact, the rules, the specific notes to the rules of Federal Procedure 23 say that a consumer fraud action is a particularly appropriate action to find predominance. Because, in such an action, you have a defendant who is engaging in conduct that's specific to that defendant, which is affecting a large group. And particularly, as in this case, we have a fairly common class of individuals that are looking to attend Ryder Law School. But it's true. That may be true, but the district court found that there's not much uniformity in the damages that they may have. I understand what you're saying. That may not, but in an individual case, I mean, don't you need some uniformity in order to maintain a class action? No, we don't, Your Honor. In fact, in this court's recent decision, which, Your Honor, I believe is on the panel, in Neal v. Valvo, 794 F. 3rd, 353, the court specifically held that even if individuals have specific differences in calculation of damages, that does not justify defining predominance. Now, this seems like a new argument to me. It seems to me that you focus, your focus thus far, has only been on losses with respect to tuition. That job success, placement, is immaterial. Yes. And it's essentially a matter of calculating the difference between the tuition paid and the tuition that should have been paid. And I don't understand that you've ever looked at any facts that might apply to individuals and would call you away from that rather bold statement of class loss. Your Honor, that's exactly correct. My point was simply that even if our theory did require that, the decision below would still be wrong. But our theory clearly does not require that. Our theory is specifically based on the time that the tuition is paid by a student, and whether they graduate, whether they get a job, whether they become a Supreme Court justice, is irrelevant to our damages theory. Our damages theory is they were harmed at the time that they paid a tuition that was You're going to have a hard time convincing me that a student who goes from Widener to a Supreme Court clerkship paid tuition that was too high at Widener. Judge, the point is that tuition is determined by economic factors in the marketplace. And what happens to someone after they receive whatever the product is, is irrelevant to the tuition they pay. What about the losses? Change the tuition price based on whether the person got a job afterwards. Judge Barry, could you ask your question again? I'm sorry, Judge. What about the losses that unemployed individuals suffered, incurred presumably by a subset of your proposed class? If we permit this class action to move forward, could those be barred? No, they could not. We are seeking a specific legal theory and a specific set of damages, and if those people opt in to this case, then they are bound by the decision in this case. Our damages theory in this case is very specifically based on tuition, and whether or not those people got jobs where they made $50,000 or zero is completely irrelevant to it. How do you bring in the individualized part that you opened with? Your Honor, I was only making a legal point. I was making a point that you could still find predominance in this case based on the many common questions of fact, which predominate over individual questions of damages, even if what the judge said was correct. But what the judge said was incorrect because it misstates our theory. Our theory has never been that we're going to put in any evidence about people after they graduated or what their jobs were or whether they got jobs. This is not a case by people that didn't get employed after they graduated from Widener. This is a case based on somebody getting something less than they were promised. They were promised a legal education from a law school that had a 90 or over 90 percent placement rate when, in fact, that law school now admits in its own records that it had somewhere in the area of a 57 percent legal full-time placement rate. So we got something less than the loss. Let's talk then about what the evidence or methodology is that you say establishes these class Y damages. Yes. You've argued that there's independent evidence that the reported job rate affects tuition prices. What is that independent evidence or does this appeal really hinge on the reliability of Dr. Martin's methodology? Is that the only evidence that we have to work with on this record? Well, there's evidence within the record, including Dr. Martin's report, which shows that there is a relationship. There is a relationship between placement statistics that are reported by law schools and tuition prices. Other than Dr. Martin's report, what is the evidence of any linkage between Widener's tuition and those reported rates? Well, the evidence is simply that the market for – we are going – I mean, the evidence is publicly available information because that's all we had. By the way, we requested data, and the record will show we requested data specifically on Widener and how they set their tuition rates, and the court did not award that, and the defendants refused to give it, claiming it wasn't relevant to class discovery. And the court noted in its opinion that we were entitled to that data. But my argument would be we don't need that data for purposes of deciding predominance because predominance is simply looking at what issues are out there that are common to the class and that whether on a qualitative and not a quantitative basis, they outweigh the issues that are, you know, individual. And in this case, I think we've clearly shown predominance. But in terms of your question about damages, we are going to show – what we have done is presented a plausible damages theory, which is all that we have to do at the class certification. We don't have to prove the theory. We don't have to show all the data. All we have to do is say we have a plausible theory, a damages theory, which when we get the data, all of the data, we can plug into that theory and we can say for sure that there is a causal relationship between – so we're not assuming a causal relationship. We're going to prove a causal relationship. To cross that threshold, though, we need to be satisfied that there is a reasonable, a just inference that can be made and it's not just speculative that this methodology in fact would show ascertainable class-wide losses. I generally agree with that. I might not put it quite the way you did, Your Honor, but I would say the Supreme Court and Comcast, I would hope you would agree. Okay, so let me address the Supreme Court and Comcast. Because the Supreme Court and Comcast was dealing with a situation where there were several damages – I mean, several liability theories, and the damages theory did not distinguish between them. And so, based on what was in front of them on the record, there was no way for that damages theory to actually state what the damages were for the actual liability theory. But you've got one theory of damages. Your theory is you, class members, overpaid tuition. It's that simple. Yes, that's right. During 2011, there was a widespread issue with all these law schools about the misreporting of employment statistics. Did Dr. Martin use that data or find that data? Is that data set painted by similar misrepresentations at other law schools? How do we draw any reliable conclusions here? He did use that data, and we cited to another study that's in our complaint that was made by another professor who looked at the issue of tuition and the price of tuition and also found that there was a relationship between tuition and placement. But what he did is he looked at data that was available for many different law schools, including law schools that were comparable to Widener International. And they were misrepresenting as well, weren't they?  How is there any reliability here? The question is not whether they were misrepresenting. The question is whether there is a relationship between what a law school claims its placement statistics to be and what the price of its tuition is and what potential law students will pay to attend that law school. How do you figure that out? I mean, what is the magic number? How much is too little? How much is too much? Judge, there is clear literature on this that doing economic regression analysis, you can take all the factors, and Dr. Martin has laid them out in his report, and many, many courts have accepted just this type of regression analysis. In any kind of antitrust case, this is exactly what they do. They look at it, and they isolate the factors, and they say, if this conduct, in this case anti-competitive conduct, was not present, what would the price be? That's exactly what we're doing here. We're looking at a specific type of conduct, a fraud that's going on, misleading information. Aren't you relying on the fraud, on the market theory that the Supreme Court of New Jersey rejected an international union in this kind of case, almost identical kind of case? No, not at all, Your Honor, for a number of reasons. First of all, I would point out that the Supreme Court, since that decision, in Inway Mercedes Marketing, 267 FRD 113, in Lee v. Carter-Reed, which is the Supreme Court of New Jersey decision, 203 New Jersey 496, and in Peruto v. TimberTech, 2015 Lexus 16592, they have clearly indicated that what was going on in international union was the fact that there was complicated and complex decisions going on by pharmacy benefit managers about whether they even would have purchased this drug that would have created substantial individual questions of fact and questions of causation. So there would have been the question of whether or not there even would have been an ascertainable loss. That is not the question here because if they'd known about the supposedly inflated statistics, the applicants would not have gone or could have opted not to go and opted to go somewhere else. No, because what we are arguing here is what the value of what they got was in the real world, not in some but-for world, but in the real world, what was the value of what they got? And they all did attend Widener. We're not saying we're going to go back and try to prove whether they attended Widener or they didn't. What we're saying is they bought something, they bought a product, legal services, that was not what it was represented to be and it wasn't worth what they were being charged for it, and we're going to prove how much it wasn't worth. Counselor, you're out of time, but I have a question Judge Krause does as well. One of my questions, it's related, it's a causality question. In the ordinary fraud case, in order to show that a misrepresentation caused damages, you have to prove reliance. Now, I understand with the consumer fraud statutes here, strictly speaking, don't require any type of reliance. And I take it you're not proposing to prove reliance in a conventional sense, but we can't just presume class-wide reliance here, can we? And if we don't have reliance, then how are you going to prove that these misrepresentations approximately caused every class member to suffer damages? It's a big question, Your Honor. The answer is that the New Jersey Consumer Fraud Act and the Delaware Consumer Fraud Act were specifically designed to avoid the problems that occur with trying to prove reliance. And for that reason, what they say is if there is a defendant who goes out and makes misrepresentations widely, as happened here with a mass marketing campaign, and they intend those misrepresentations to be relied on, and there is an ascertainable loss, and I'll get to that in one second, that's it. You don't have to prove reliance. You don't have to prove what any individual would have done, whether or not they would have relied on it or wouldn't have relied on it, because they are so concerned about addressing this kind of deceptive behavior that as long as there's a damage that's incurred by the people, an ascertainable loss, and the actual definitions in the Supreme Court cases are something less than what they thought they were getting. That's it. That's an ascertainable loss. They got something less than what they thought they were getting. And the answer is they did get something less. They got a law school that had a placement. That's like saying if TWA says, well, we only crash 3% of the time, and people say, oh, well, I'm going to fly to TWA, they're getting something less than what they were promised if, in fact, they crash 47% of the time. Those are significant statistics that just in common sense people are going to rely on, but the New Jersey Consumer Fraud Statute and the Delaware Fraud Statute don't require that. All they require is ascertainable loss. We can show that because we can show that the price would have been lower, and therefore there would have been an ascertainable loss. Just one quickie follow-up. Are there any material differences between Delaware law and New Jersey law here? I didn't see any in your briefs, and, you know, for our purposes here. No, Your Honor, only that New Jersey law uses the term ascertainable loss, and Delaware law uses the term damages. All right, thanks. Judge Krause? So let's put aside the reliance issue. We still need to, as you acknowledge, we need to have some methodology to get to the ascertainable loss. Correct. And if we accept, even if we accept the regression analysis of the experts here, as establishing that in a perfect market, in an efficient market, that there would be some identifiable, quantifiable effect of the misreporting of employment data on tuition, isn't the fundamental problem here that there's no evidence that that, in fact, would have changed or did in any way affect Widener's setting of its tuition? And that's where Merck and AstraZeneca seem to come into play. Whether you call it fraud on the market theory or not, the premise is if you don't have an efficient market because the producer, whether it's the pharmaceutical company or the law school, is the one setting the prices, then you can't use a type of theory that assumes an efficient marketplace. And the answer to that, Your Honor, is that in antitrust cases, economic experts routinely compare non-perfect economic markets. They do not try to figure out what an economic market would be or what a perfect economic market would be. They do not use fraud on the market theory. They use economic regression analysis, which actually looks at the factors in different markets, compares those markets, and takes out the factors that would be different between those markets until they can equate the markets. In some cases, both those markets could have anti-competitive behavior. In some cases, both those markets could be imperfect in other ways. But that's not the way economic regression analysis works. It's not the same as fraud on the market theory, which is really a reliance theory, by the way, which is simply that there's perfect information in the marketplace, and so if somebody's lying about something and that information came out, the price would behave in a certain way because everybody would know it, and therefore we should assume the price is going to move. By the way, I would point out that the Supreme Court itself has recently, in the Halliburton case, pointed out that that's now a rebuttable presumption, at least in certain class actions. So it's just the same as, you know, an issue of, you know, eventually there's going to be evidence on both sides at a trial, but at this point you're not supposed to even decide whether or not our theory is a theory that we can use at trial. All you're supposed to decide is is it plausible, based on the evidence in the record, is it a plausible theory that if we have the data, we can use it and establish, you know, ascertainable loss. And I think we've shown that. And, in fact, I don't see how else you would show that. All right. Thank you, counsel. We'll hear that rebuttal. Thank you. We went over it a little bit. We'll give you a little bit. Can you have three minutes out of the appellee's time? Thanks. May it please the Court. I'm Thomas Quinn of the Wilson Elsa Firm. I am co-counsel to Wagner University School of Law, along with Dennis Drasco of the Lomond Drasco, and Positan, not Politan, firm. We wrote Politan, we just found out, on the brief. A Freudian slip in the District of New Jersey. Welcome. Thank you. Your Honors, the district judge, at pages 13 and 14 of the decision, really hit the nail on the head in this particular case, dealing with the outstanding loss, and it went to the very questions that were being posed here. And it was the plaintiff's contention that law school tuitions are set by economic factors and that, thus, the employment statistics would be factored into that. And on page 13 of the decision, the district judge said, plaintiff's theory of damages still relies on a market dynamic that they have not proven to exist. I think that that's a key point in this matter. Because once you follow that through, the reality is, is that this judge is absolutely correct when the judge says, it's Wagner that sets its tuition prices. You don't have a marketplace. You don't have bidding to go to law school. Not everyone gets in the same law school. So there's not a bidding process that goes to there. Counsel. I'm sorry. Go ahead. You're pointing out the flaws you did in your briefs with the argument that there's not evidence as to how Wagner set its tuition. So even if the regression analysis here goes to how a perfect marketplace would work and puts forth a plausible theory from a reliable expert on that, we have here Wagner setting its tuition and no evidence about how that theory may apply in practice. What then do we do with the point that counsel raised and that we also noticed looking over the district court record, that in their discovery request, which went specifically to the question of how does Wagner set its tuition, what are its policies and its procedures, Wagner objected to discovery successfully and asserted that the setting of tuition prices was irrelevant to the claims and went beyond class certification issues, that that was a merits issues determination. Isn't it a little unfair to have objected then and now using that as your sword? And, Your Honor, most respectfully on this record, it is not, and here's why. The complaint gets filed beginning of 2012, first amendment complaint is April of 2012. Their expert report, and they know that they have to come forward with it, their expert report was issued in September of 2014. If there were rulings, if you're working with your expert and you know along the way that you need evidence of tuition in order to make out your case, you know that the rigorous standard applies to you. It's your burden to prove class certification. Then you have to start creating a record. There is no decision in this case in record where after the magistrate judge ruled on a particular issue that an appeal was taken to Judge Walsh on the tuition issue and Judge Walsh said, no, I'm going to affirm that's off record. Well, I must say I have to take issue with you. Footnote three, at age 16, says the following. The court acknowledges plaintiff's contention that Widener has not produced any information about tuition prices. I would test those prices or any Widener price analyses. Such information is relevant to class discovery and should be produced if available to aid plaintiffs in assessing whether punitive class numbers damages can be proved by common evidence. What, if anything, did Widener do in response to the direction of the district court in footnote three? Your Honor, at that stage, I mean, that was the district court's decision denying class certification. We did not produce, there weren't any discovery requests available. Discovery clause in the motion to reconsider got filed, I think it was 20 days thereafter. That was the procedural history of it and then the appeal was taken to this court. But to go back to the issue, there was nothing in Dr. Martin's report that talked about tuition, Widener's tuition or the setting of tuitions by any of the other law firms. Interesting. I always think there's sort of an open question in these class action cases where just how much class-wide evidence should a plaintiff have to offer at the class certification stage to prove that a question is capable of resolution through class-wide, rather individualized evidence? And also a reasonable jury could find and play this favor on that specific question or something else? Analogizing this court's recent decision in Reyes, what the court said was that it was what the court was critical of, the district judge saying that the district judge was requiring an absolute proof and that it should be by preponderance of the evidence. And I would say that that's really the standard that should apply here. The plaintiffs should be able to show that they meet all of the requirements of the New Jersey Consumer Fraud Act because, let's face it, Delaware follows the same one. So they should be able to meet all of those requirements, including ascertainable loss. It is their obligation to show that by preponderance of the evidence, and they fall woefully short here. But if they're to have a fair chance of doing that, especially given the request that they made that Widener successfully objected to and the district court's acknowledgement that that discovery may well be relevant to certification issues, why shouldn't we remand for the court to reopen discovery on that point and then reassess the question of certification? Because most respectfully, Your Honor, this was a situation where the plaintiffs truly made a tactical decision as to which way they were going to go. Their expert report comes out in September of 2014. The record will show that there was a stipulated briefing schedule agreed to by all parties December of 2014. That was right after some discovery issues related to that. The plaintiffs themselves wanted to move forward with the class certification process because, candidly, they were buoyed by the prior decisions by the district judge on the motion to dismiss and then our reconsideration of the motion to dismiss. Then once they see the district court decision is now all of a sudden raising that particular discovery issue, when there's nothing in their expert report about it, they could have put in a report from Dr. Martin as part of the class certification process saying, I need more. I need information about tuition. And, candidly, when he's comparing it to 64 other law schools, as Judge Barrett pointed out, there's no evidence about how those law schools were handling tuition. They didn't seek discovery from those other 64 law schools that they were using. They have no idea how they set tuition. There's nothing in the record that shows that. Did you have a competing expert report in the record that directly rejects Dr. Martin's analysis such as it was? We had competing expert reports. They were not of a statistical variety, Your Honor. And so, with respect to that, I think that on this particular record, to remand it back on those particular issues is not going to overcome the problem that the New Jersey Supreme Court pointed out in the Murk case, that you cannot use an expert to fill in the gap of that ascertainable loss. There was a holding in the case. And that case is so closely analogous to this situation. I look at that case, and I see the prescription benefit managers, and to me, they're the law school setting prices. And then I see the people out there buying the Vioxx, and they're the students. Well, perhaps you can't fill in the gap. Again, if, say, Discovery were to produce emails that showed that Widener actually uses Dr. Martin's multiple regression analysis and takes account in a very specific way of the employment data in affecting tuition prices, or emails that reflect a direct link, we may have to lower our tuition. If these unemployment statistics are disclosed, make sure that they stay at this level. Wouldn't those sorts of things combined with the report be sufficient for class certification purposes? I don't think so, and I think there's the practical issue in this case, keep in mind from the record. In 2012, Widener issues amendments of how they start keeping the statistics about that. And then they do that, obviously, in 2013, 2014, and onwards. And there is no evidence that the plaintiffs put forward about the tuitions in all those years, 12, 13, and 14, significantly decreased. The reality is they didn't decrease, they increased, which is sadly not an unusual situation that's occurring with the law schools today and the issues that they face. I have two kids in college, and it's very sad. Yes. And so the point is that, admittedly, we took the position that that was merits discovery, and we did not produce on that. But there was no effort made to get that issue teed up for discovery purposes to the magistrate judge and then take the appropriate appeal to the district judge, which would be required, so that an appeal could be taken to this court so you could look at that order in conjunction with the order denying class cert. And I truly believe it was a tactical decision made because they were bullied by what had happened in the motions to dismiss. And there was nothing that you could argue. You don't need to say they were bullied by the district court judge. Well, I didn't mean bullied. I'm only teasing. Your Honor, I've been accused of not talking very clearly by Mr. Drasko. Well, I was a district court judge for 16 years. I guess I have a thin skin. Counsel, don't we have another problem in terms of the district court's ruling? Because it does seem to have rejected the damages theory, at least in part, as it articulated on the grounds that the loss by students who got full-time jobs was different than those who had part-time jobs. That does not, in fact, seem to be the theory that they were pressing. Put aside a lot of the case issues, to the extent the district court was relying on that to find the absence of predominance, isn't that another error that we might consider remanding for? Can we rely on the judge's reasoning as a result of that potential error? I truly think that you could rely upon the judge's reasoning. I think that the judge was correctly pointing out that there are a number of individual issues that get set in this whole idea of, I didn't get what I thought I was going to get and what I thought I was paying for. And I thought that that was a typicality. And, Ken, that was the same issue that occurred before this court in the Marcus case. It seems to be apples and oranges, really. I mean, if you mischaracterize a theory of damages, how can we be really sure the district court sort of understood what the actual theory of damages was? Because, respectfully, I think that the district court's analysis at pages 13 and 14 of the decision is just dead on, with understanding that it was up to – the plaintiffs had not shown that this was the efficient market. That's not the reality of how tuition gets set. So there isn't a bidding and marketplace. It isn't set by the stock exchange and the buying of securities. And so the district judge's point was that this falls squarely within what the Supreme Court decision were. So you're arguing it's harmless error if it's error?  And the New Jersey Supreme Court's holding in Merck, saying that it was not enough to have an expert to fill in the ascertainable loss gap, has not been overturned by the New Jersey Supreme Court. But there they were offering just an opinion. Here they've gotten more, right? They've put forward a multiple regression analysis. In the Merck decision, reading the decisions, especially when you read the underlying appellate division opinion, they had ample expert testimony trying to do the same. But you have too many individual issues in the decision-making and price-setting factor. And that's really where the analogy holds so true between this situation and the Merck situation. The whole setting of what the price is, what the formulae should be for Vioxx, and what should be admitted in the prescriptions is exactly the same type of processes, the individual processes that get made in all the 64 law schools that were used by Dr. Martin in the report. And the various decisions that get made by the consumers themselves, the people who actually purchase Vioxx, they're just like the law students. And that's really where the analogy just holds so true. Do you agree that as we think about what the theory here is, that it's really not so much a traditional fraud-on-the-market theory, that is one that creates a presumption of reliance. We don't need to be concerned about reliance given the nature of the claims here. It really goes to whether or not there's an efficient market. Is that right? Correct. It goes to the issue that, yes, effectively that they're trying to say that there's an efficient market here, that law school tuition is generated by economic factors. And there was nothing in the record to evidence that that is so. So would you agree it's not quite a fraud-on-the-market theory that they're propounding, right? Correct. I would agree that it's price inflation through an expert that becomes an awful lot like fraud-on-the-market. So, I mean, I didn't get what I paid for. So you're saying this price inflation theory is equivalent to fraud-on-the-market, which has been rejected. Is that what you're saying? Yes, I do. Okay. Maybe if there's no other questions, maybe we can move to typicality, whatever argument you have on that. You know, we are supportive, as we said in the briefs, on the typicality issue. So your argument is that the factual circumstances underlying the theory are markedly different, depending upon the pre-2011 and the post-2011 students, I guess? That's a significant part of it, correct. But, I mean, the whole concept, I mean, there's any number of these cases about the employment statistics and the law schools that have worked their way through the courts. And everyone is, you know, trying to find that, you know, the theory that makes it a plausible class action. And I just think that throughout the whole process, I think it's obvious. Do you know how many cases maybe are involved in others? I am not personally, and I'd have to look back if someone else could do that. I apologize. I thought that there were more than a dozen. Okay. Well, I think there's at least 15. One of them settled for a low amount of money, and the other one was lost at jury trial. And I think the others were all on a motion to dismiss. But why one goes to law school, to a particular law school, is a complicated thing, I think. And I think that that's, Your Honor, correct as part of the typicality. It's not just tuition. It can't be. Especially for schools like Widener that really draw from a particular geographical base. You know, the reality is that I don't have the evidence right in front of me, but it's not as if we have hundreds of kids, hundreds of students from Alaska or even California. I mean, we draw on a particular marketplace in the Delaware, Pennsylvania, New Jersey area, Maryland as well. And that's where we primarily draw from. And so the whole setting of – and so that's why, ultimately speaking, I think that when you – Dr. Martin's report was the only evidence that they proffered. That was one of the questions before. Another point on typicality. I mean, can we really say that the named plaintiffs are atypical of the class merely because of the theoretical possibility that some class members might prefer not to be involved in a lawsuit that tarnishes the law school's reputation? And if we adopt that reasoning, doesn't that have sort of sweeping consequences for a lot of class actions? Perhaps, but I think it goes back to the point, ultimately speaking, of what an individual decision it is that's made here. I mean, for example, just as by way of example, three of the plaintiffs, this whole theory of I didn't get what I paid for and I might have had options if I had known the true set of facts, three of the named plaintiffs, the only law school they got in was Biden. So that theory of I had other options that I could have weighed upon and why I didn't get what I paid for, it was the only option. Does that make sense? Well, an X number only applied to Biden. Judge Berry, we're out of time. Do you have any more questions? No, thank you.  Judge Krauss? Okay, thank you. Thank you. Thank you, Your Honor. First of all, I agree with what Your Honors have been saying, that we never got this data. We tried to get it on numerous occasions and were rebuffed. And the reason we didn't believe it was relevant, frankly, and I still don't believe it's relevant, it's relevant to proving the trial, the case of trial. I'm not suggesting it's not. I would like to have it because our experts always say they prefer to have more data and data specifically as to the specific defendant. But in this case, all we had to do was articulate a plausible theory, and I would cite to Ways 802, F3, 469, 489, where it says, predominance is satisfied if the plaintiffs present a plausible theory for proving class-wide injury. We're not supposed to prove our case at the class stage. And I think, as Your Honor mentioned, that is not, the case law doesn't support that. It is confusing because the class certification standard is really based on issues relating to, is this appropriate for a class action, not can we prove this at trial. And related to that, this very judge, to show how confused and how erroneous this decision is, on his motion to dismiss, he found what happens after they leave is irrelevant and agreed with us. He simply said, we have a legal finding, it's irrelevant, and then somehow found it relevant on Rule 23, which makes no sense at all because the only reason he'd be looking at it is to determine whether or not predominance was met. And if it's irrelevant, then it can't be relevant to whether predominance is met. Counsel, what do we do with the fact that Dr. Martin's theory does seem to rest on an assumption of an efficient market? He even says in paragraph 19, an example of his principle may be activity in the stock market. But we have neither evidence of or from him proof of an efficient marketplace on the one hand, and on the other hand, although you've stated here you thought and perhaps still think it's irrelevant, we also don't have evidence in the record as to Widener's own practices in setting tuition. Without at least one of those, how do we have here a sufficiently reliable theory to satisfy the Supreme Court standard for ascertainability? First of all, I do agree that if the court believes it's relevant, that we need to have looked at that data. It should be remanded and we should be allowed to look at that data because we weren't allowed. But with respect to the question about Dr. Martin, the point he was making, and he was just giving an example of a stock market, is simply that if different actors in a market act in a particular way, the price can move. It doesn't have to be a perfectly efficient market. The point is simply that if a few actors in the market move in a certain way, that can affect price, even if not every one of the actors in that market would have moved in that way. That's the only example he was giving. He wasn't using fraud in the market. He wasn't suggesting, he's assuming that the market's going to work that way. He's going to look at the data and determine if the market works that way. What I would say is he has looked at data. The data is for comparable law schools in other types of cases like antitrust cases. This is exactly what they do and they grant class certification. They look at what's out there and they say, here's my theory, here's how I'm going to establish it, and when I get the data, and here's why it's more likely than not there will be a causal relationship. And he's saying it's more likely than not that there's going to be a causal relationship because when I look at the data out there in the marketplace, I can see a causal relationship when I do a simple regression analysis. Now I need to look at Weiner and the specific data in this case, but at least it's more likely than not that that relationship is going to be there. I think that that establishes sufficiently for predominance because we have to remember, again, determining whether or not there are common issues of fact that outweigh the individual issues of fact. That's all predominance is and that standard is normally met in a consumer-flawed case. Given Merck and AstraZeneca, those are out there, why not at least have taken an appeal to the district court judge on the discovery issue? What happened, Your Honor, is we were involved in numerous discovery disputes with the defendants. This was going on for months and months and months. We weren't getting the data. The case was just languishing. And so we took the data that we could get without having to fight about it because we believed while we wanted that data and we had asked for that data, we believed that the standard was such that we could meet it without that data. As long as we had that data to prove it at trial. And it's only when the judge, for the first time, said to us, well, you've been saying all along that that data isn't relevant to class certification. When he said now it is, now we're in a and he ruled all these other rulings that we think are erroneous. So even if we went and got that data, he's still saying we'd be out. We had to take this appeal. We didn't really have a choice. Okay. Thank you, counsel. Thank you. We'll take this case under advisement. Thank you, counsel, for excellent briefing and argument.